MISSOURI PACIFIC RAILROAD COMPANY v. MANION.

4-5193                              120 S. W. 2d 715.

Opinion delivered October 24, 1938.

982

*Thomas B. Pryor* and *Harvey G. Combs,* for appellants.

*E. H. Bostic* and *W. P. Beard,* for appellee.

MEHAFFY, J.  The appellee filed suit in the Lonoke circuit court and alleged in his complaint that he was the administrator of the estate of Lizzie Webb, deceased; that one of the trains of the Missouri Pacific Railroad Company going through the town of Ward, Lonoke county, Arkansas, while Lizzie Webb was attempting to cross the track, struck and injured the said Lizzie Webb so that she died soon thereafter; that the train was being driven through said town at a high and excessive rate of speed without the use of ordinary care for the safety of appellee's intestate and the general public; that appellants failed to exercise ordinary care in that they did not keep a proper lookout and did not give any warning either by ringing the bell or blowing the whistle; that if appellants had been keeping a proper lookout or had given proper warning they could have discovered the perilous position of appellee's intestate in time to avoid striking and injuring and killing her; that because of the negligence in operating the train, appellee's intestate

was struck by appellants' train, hurled through the air approximately 40 feet, receiving injuries to her head and back and breaking both legs, from which injuries she afterwards died; that subsequent to striking Lizzie Webb, appellants negligently and carelessly caused said train to block the crossing, thereby preventing those aiding and assisting said Lizzie Webb in rushing her to an available hospital. Appellee prayed judgment in damages in the sum of $3,000.

On October 7, 1937, appellants filed answer denying all the material allegations in the complaint and pleading contributory negligence of appellee's intestate.

There was a jury trial and a verdict and judgment for $1,000. This appeal is prosecuted to reverse said judgment.

John Manion, the appellee, testified in substance that he lived at Ward, Lonoke county, and that the deceased was his mother-in-law; that he was appointed administrator by the probate court, and introduced letters of administration; the deceased was 65 years old when she was killed. Witness did not see the accident, but learned of it shortly afterwards; saw her at Dr. Utley's office; she was conscious and suffering; every time she was moved she would scream and try to catch; both limbs were injured, and she asked not to be touched; she lived about thirty minutes, possibly longer, after she was taken to Dr. Abington's hospital at Beebe; in Ward she lived on the north side of the track and had a garden across the tracks, and it was customary for her to go across the tracks to get to the garden; the path was generally used by the public; there are cross-ties, logs and lumber piled along between the gravel highway and the main line in front of her house; she was conscious when witness arrived at the hospital.

Ernest Bailey testified that he lived in Cabot and was in the lumber and automobile business and mayor of the town; he was on the platform of the berry shed inspecting lumber at the time Lizzie Webb was killed; the Missouri Pacific has two main line tracks running through the town of Ward; there is a switch track on the right-hand side of the main line track going north; the berry

shed is right up against the switch track; there were four or five railroad cars parked along beside the berry shed; two box cars and two furniture cars; he was loading one of the cars; Mrs. Webb lived right across the track from the berry shed; on the west side of the main tracks is a gravel road or street, and south of the berry shed is a crossing; there is a curve just below the depot; the first curve south of the berry shed is approximately one quarter of a mile; there is a path that crosses the railroad between some crossties stacked along there and in front of her house; witness has been loading lumber at that point since 1928 and observed people going across through this path; the general public in the vicinity of Ward uses this path; he was on the platform when deceased was hit; she was hit by freight train about one-thirty or two o'clock; did not actually see the train hit her, but saw her immediately afterwards, imagines the train had around sixty or seventy cars; train went two-thirds its length before it stopped; did not hear it whistle and knows that it did not whistle a distress whistle; does not know whether it whistled at all; did not hear it; there is nothing to prevent anyone seeing up the track after coming around the curve; can see about a quarter of a mile; train usually comes through Ward about 50 miles an hour; after it passes the curve there is nothing to prevent the engineer seeing it if there is anything on the track; in using the path Mrs. Webb would go between the crossties; there was nothing from where she got hit on down to the curve to prevent the engineer from seeing her; the track is straight a quarter of a mile; Mrs. Webb complained about her lungs hurting her and about how she was suffering; she was conscious; took her to Dr. Utley's office at Cabot; the train stopped, but did not break for the crossing; when witness left the crossing was blocked; does not know how long it was blocked; in order to get to the pavement had to go around three-fourths of a mile over rough road; if the crossing had not been blocked by the train, he would have had to drive two blocks to the pavement; the conductor was there taking names of the people who knew anything about the accident; took her to Dr. Utley's office and was there when he

examined her; both legs were broken and she was complaining and suffering; was delayed by the crossing being blocked, the time it took him to drive three-fourths of a mile over a dirt road.

Otis Read testified that he lived at Ward and had for the last twelve years; runs a cotton gin which is located by the Missouri Pacific railroad track at the north end of the berry shed; was in Ward when Mrs. Lizzie Webb was killed by the train; did not see the train hit her; is sure the train did not whistle and the bell was not sounded while it was coming through Ward; there was a path running across from the north end of the berry shed from Mrs. Webb's house; the path is used generally by people going from and to Ward; was right at witness' place; witness crosses there on the path three or four times a day; has seen many people come through there; is positive the train did not whistle; knows about the time of day that the train goes through there; there is but one train that stops at Ward regularly; the train sometimes whistles when it comes through there.

M. F. Garrett testified that he lives in Ward and was there when Mrs. Webb was hit and killed by the train; he was a little distance from the railroad track; the train did not whistle; if it had whistled witness would have heard it; was hauling lumber at the time and was coming into the shed with a load; had lived in Ward thirty years; there is a path that is frequently traveled that crosses the track where she was hit; quite a few people cross there.

B. B. Walker testified that he lived in Ward and was there on the day Mrs. Webb was hit by the train; noticed that it did not blow the whistle nor ring the bell; he was paying attention to it; there was nothing to obstruct the view between the place where Mrs. Webb was hit and the curve; if the engineer had been looking out he could have seen her after reaching that curve.

Dr. Utley testified as to her injuries; she had been hit by a train and both lower limbs were broken; she complained of her left lung hurting her a great deal; she was suffering pain.

The witnesses for appellants testified that the bell was ringing and that deceased heard the train; but if the

evidence introduced on the part of the appellee is substantial and supports the verdict, the jury's verdict will have to be sustained, notwithstanding appellee's witnesses were contradicted by witnesses of appellants. In other words, the rule here is that if there is any substantial evidence to support a verdict, this court will not disturb it.

It is first contended by the appellants that the evidence in this case is totally insufficient to support the verdict. Some of appellants' witnesses testified that the whistle was sounded and one or two of them testified that there was a distress whistle. The engineer testified that after he got over the crossing he was getting close to the depot and started blowing the whistle with his left hand and looked back around the curve to see if the train had any hot boxes, and just as he approached the switch he turned his head around and saw the two women getting off the track; saw one woman take hold of the other and the other turned around and just as he saw her turn around, he knew she was not going to be safe and in the clear; he began to apply his emergency brake, but was unable to stop the train and one of the cylinders hit her; they were clear across the track when he first saw them.

The evidence shows that after they came out of the curve there was approximately a quarter of a mile to the place where deceased was struck; they were going about 50 miles an hour and had 51 cars in the train; this engineer testified that when he saw the women they were not in danger, but one woman took hold of the other's hand and she threw herself in the path of the cylinder; he looked back at them a moment when he got close to the crossing and then turned his head around and was about 600 feet from them; he testified that he applied the emergency brakes immediately after he saw that they were in danger; that he looked back as he came into Ward on that curve just as they were coming around the curve.

It is entirely probable that if he had looked ahead as the law requires, he would have discovered their danger in time to avoid injuring them.

The engineer testified that he did not know whether he gave a distress whistle or not and then added: "I did

not give the distress whistle because I did not have time.''
This evidence shows that after he turned his head and
looked ahead he saw the danger; just how long he looked
back is not disclosed by the evidence. It does show, how-
ever, that the engineer saw them in close proximity to
the track, and that instead of continuing to look, looked
back, and then when he looked ahead again discovered
their danger.

T. D. Norwood, witness for appellants, testified that
he was fireman on the train that struck and injured Mrs.
Webb; he did not see the accident; when he was coming
around the curve at Ward he saw two ladies on the oppo-
site side; one lady had hold of the other lady's coat or
hand and was pulling her across the track and that is
when they went out of witness' sight; came on across the
track; when witness saw them crossing the track he did
not give the engineer any signal because he did not want
to kill the rest of them; engineer could have done that by
applying the emergency brakes; witness supposes he did
apply the emergency brake after he hit her.

The conductor testified that he was in charge of the
train, but did not see the accident; that he supposes the
engineer applied the emergency before she was struck;
he felt the emergency brake applied; imagines if the engi-
neer was looking back he was looking for a hot box; it was
his duty to look back.

Photographer testified and introduced photographs
that he had made.

The evidence shows that crossing the track with de-
ceased at the time she was killed was an old lady 80 years
old, and evidently the deceased was helping her across the
tracks. She testified that deceased said she heard a train
coming but thought they could get across; that she was
knocked under the cars and when she came to herself
she was lying there in a dream; deceased took witness'
arm and they crossed both tracks; witness did not get
hit; when the train came by deceased jerked loose from
her. She apparently knows very little about the accident
or how it occurred, and while she testified that deceased
said she heard the train, witness did not hear the train,
and did not testify as to hearing any whistle or bell.

The undisputed evidence shows that the fireman saw the ladies crossing the track and evidently thought they were in danger, for he said he did not signal the engineer for fear he would put the emergency brake on and kill some of the persons on the train; he said he feared that if he notified the engineer and he applied the emergency brake, it would "kill some of us." That is the only reason he gives for not notifying the engineer. The engineer, according to his own statement, was looking back, and the fireman saw them crossing the track in front of the engine and took no precaution whatever to avoid injuring them because he was afraid the engineer would do the very thing that manifestly should have been done —apply his brakes.

Counsel have cited a great many cases, but the law is well settled, and, under the look-out statute, § 11144, Pope's Dig., provides that it is the duty of all persons running trains to keep a constant lookout for persons and property upon the track, and if any person or property shall be killed or injured by the neglect of any employee to keep such lookout, the company operating such railroad shall be liable to the person injured for all damages resulting from neglect to keep such lookout, notwithstanding the contributory negligence of the person injured, where, if such lookout had been kept, the peril of the person injured could have been discovered in time to have prevented the injury by the exercise of reasonable care.

It would serve no useful purpose to discuss the many authorities cited. Appellants rely largely on the case of *Todd* v. *Railway Co.,* 106 Ark. 390, 153 S. W. 602, and state that the facts in the Todd case are remarkable in their similarity to the facts in the case at bar. In the Todd case the railroad witnesses said they saw the boy walking between the tracks, but there was nothing unusual in his conduct, just regarded him as another man, as they so often saw men at that place. The court in that case said that Todd was a mere licensee on appellee's right-of-way when he attempted to cross at the time he received his injury; as such licensee the only affirmative duty the appellee owed him was to keep the lookout re-

quired by the statute. It did not owe him the duty to give the statutory signals required for the protection of travelers at public crossings on the highway.

That statement was true as to the facts in that case, but the statute makes it the duty of persons operating a train to keep a constant lookout for property and persons on the track, and the statute means anywhere on the track, and not at crossings only. The statement that the railroad company owes a person on the track no duty except to keep a lookout was stated with reference to the facts in that case, and is not only not true generally, but contradicts the statute itself. If that is the only affirmative duty owed to a licensee or a trespasser, for that matter, the persons operating a train could keep a constant lookout, might discover a person on the track in peril, and without taking any precaution at all injure or kill the person. They not only owe the duty to keep a lookout, but if they discover a person on the track it then becomes their duty to exercise reasonable care not to injure him. In this case the fireman discovered them on the track and did not let the engineer know it because he was afraid he would apply the emergency brake. The engineer was looking back, and when he looked forward again he saw them in danger, but said it was too late for him to do anything.

This court quoted with approval recently: "It is clearly the duty of a railroad company at common law to give notice of the approach of trains at all points of known or reasonably apprehended danger. And failure to do so will render the company liable where such failure was the proximate cause of injury to one not guilty of contributory negligence." *Mo. Pac. Rd. Co.* v. *McKinney,* 189 Ark. 69, 71 S. W. 2d 180.

Under our statute the injured party may recover all the damages resulting from the failure to keep a lookout, notwithstanding his contributory negligence. Where a person's peril is discovered and the operators of the train negligently injure or kill him, a recovery may be had notwithstanding he was guilty of negligence in going on the track, or even if he was a trespasser.

In the case of *St. L., I. M. & S. Ry. Co. v. Gibson*, 113 Ark. 417, 168 S. W. 1129, this court said: "The effect of our holding in the former opinion is that where proof has been introduced by the plaintiff of an injury to a person by the operation of a train under such circumstances as to raise a reasonable inference that the danger might have been discovered and the injury avoided if a lookout had been kept, then the burden is shifted to the railway company to show that such lookout was kept."

The court also said in that case: "The testimony on the part of the appellee tended to show that Gibson was lying on or near the track at the time he was killed; that the track was straight for a distance of two miles or more in the direction from which the train was approaching, and that a person could have been discovered lying on the track for a distance of 1,350 feet; that if a proper lookout had been kept appellant's servants could have discovered decedent in time to avoid killing him. While this testimony was contradicted by the witnesses for appellant who all testified that they were keeping a proper lookout and stopped the train as quickly as they could after discovering that the object lying on the track was a person, still this conflict in the testimony has been settled by the verdict of the jury, which is binding upon us, and we are of the opinion that there was sufficient evidence to warrant the verdict."

Gibson was a trespasser upon the track and the railroad witnesses swore that they were keeping a constant lookout. In the instant case the engineer and fireman could have seen deceased for a quarter of a mile. The reason the engineer did not see the women in peril is that he looked back. According to the fireman's testimony he did actually discover the women on the track and declined to notify the engineer.

"We think the law requires the railroad company to keep an efficient lookout, and if the person on the train is so situated that it is impossible to keep a lookout to ascertain whether persons are in danger of being hit by moving the cars, it would then be the duty of the railroad company to keep such a lookout as would discover persons

that might be hit by the moving train." *Kelly* v. *DeQueen & Eastern Rd. Co.*, 174 Ark. 1000, 298 S. W. 347.

The principal question urged is that the evidence is not sufficient to support the verdict. We think the verdict is supported by substantial evidence, and the judgment is affirmed.